UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | DEFENDANT'S POSITION REGARDING |
| | ) | SENTENCING |
| vs. | ) | |
| | ) | |
| Ahmed Mohamed Artan, | ) | Crim. No. 22-223 (NEB/DTS) |
| | ) | |
| Defendant. | ) | |

Defendant Ahmed Mohamed Artan, through his counsel subscribed, respectfully submits this Position Regarding Sentencing pursuant to Local Rule 83.10(e).

Congress has directed sentencing courts "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). With that mandate in mind, this position pleading summarizes Defendant's continuing objections to the presentence investigation report, it discusses important considerations regarding the history and characteristics of Defendant Artan and his family, and it specifically recommends a total sentence of 33 months – of probationary supervision.

1

CONTINUED OBJECTIONS TO THE PRESENTENCE REPORT

The various versions of the presentence report, and the accompanying changes to the structure and numbering of paragraphs have made it very confusing to understand where changes have been made, and to explain where relevant objections still lie. With that in mind, and acknowledging that none of the objections affect the guidelines calculations, the remaining objections set forth below are still relevant to understanding Mr. Artan's role in the offense.

Para. 62: This was previously designated as paragraph 60. Mr. Artan did not create Olive Management Inc. and was not involved with its day-to-day operation. Mr. Artan, for example, did not prepare the fraudulent meal count sheets, invoices, or attendance rosters, but he did knowingly forward the emails with the meal counts that he received from Olive management and Omar-Hashim. Because Olive Management Inc. was a for-profit business, the meal counts were sent through Mr. Artan and his non-profit. Mr. Artan's role consisted in receiving and forwarding the fraudulent meal counts. And while Olive Management Inc. may have received more than $7.4 million dollars in Federal Child Nutrition Program reimbursements, Mr. Artan received only a small portion as a fee for his services.

Paras. 65 and 69 (formerly 63 and 67): There are similar errors in these paragraphs. Mr. Artan did not prepare the fraudulent meal count sheets for the entities discussed, nor did he receive the reimbursements identified. He did participate in the

scheme, however, by receiving and forwarding emails with the fraudulent meal count sheets attached, and was paid a fee for his participation.

Para. 71: This paragraph is completely new. It contains the same errors regarding the role of Mr. Artan.

Paragraph 89 (formerly paragraph 85): Mr. Artan did not help to transfer more than $1,00,000 in federal child nutrition program funds for the purchase of the identified real estate. As set forth in the plea agreement, Mr. Artan's contribution was a $60,000 transfer from his transportation company account.

Paragraph 98 (formerly 94): The amount of restitution to be ordered should equal the amount received by Mr. Artan. That amount is accurately calculated in paragraph 92 as $205,795.54. It is true that the plea agreement, as amended by hand at the plea hearing, reflects that it should be between $250K and $666,422, but the "5" and the "0" were inadvertently transposed, as paragraph 92 makes clear. *See* R. Doc. 670 at 9, 11.

Para. 120 (formerly 116): Defendant objects to all factual assertions in this paragraph.

Para. 128 (formerly 124): This paragraph should be amended to note that the children are only temporarily residing with the uncle. As noted in paragraph 134, on 14 November 2025, he was awarded sole legal and physical custody of the children, and the living arrangements have been in flux since Mr. Artan lost his job. Mr. Artan

and his children plan to move into a new apartment in New Brighton later this month, as evidence by the lease agreement attached as a sealed exhibit to this filing.

Not included in the presentence report is the recent filing on 20 July 2026 by the children's mother seeking to terminate her parental rights (*see* exhibit filed under seal).

Para. 136 (formerly 132): Defendant objects to all factual assertions in this paragraph.

Para. 144 (formerly 140): Defendant objects to all factual assertions in this paragraph.

Para. 186 (formerly 182): The mandatory restitution amount suggested by this paragraph should be amended as discussed in the objections to paragraph 98 above.

Para. 193 (formerly 189): Same comments as noted in the objections to paragraph 128 above. Defendant also objects to the entire last sentence and any inferred factual assertions as completely unwarranted and unsubstantiated.

OFFENSE CONDUCT

The Court is well acquainted with the expansive fraud scheme that gives rise to the charges in this case. Mr. Artan's minor role in the scheme came to fruition in October 2020, shortly after the Minnesota Department of Education announced that it was no longer approving food sites run by restaurants and other for-profit companies. Defendant Artan was recruited to be president of the non-profit entity Stigma-Free International, which conveniently became a go-to non-profit for use in carrying out

the scheme. Artan's co-conspirators used Stigma-Free International to open a number of new Federal Child Nutrition Program sites around the state of Minnesota, including in Willmar, Mankato, St. Cloud, Waite Park, and St. Paul. These sites claimed to be serving meals to tens of thousands of children each day throughout the state of Minnesota, for which the co-conspirators fraudulently claimed and received millions of dollars in Federal Child Nutrition Program funds.

Over the 12-month period from November 2020 to November 2021, there were fraudulent claims submitted for reimbursement from nearly 5 million meals to children at the Stigma-Free International sites. Mr. Artan received the fraudulent meal count sheets and attendance rosters by email to his Stigma Free International account and then knowingly forwarded them on for payment. He received  fee for his services. Mr. Artan performed a similar service, for a fee, for Olive Management Inc., and likewise used Optimum Community Services in the same scheme.

ADDITIONAL SENTENCING CONSIDERATIONS

The presentence report very briefly touches on Mr. Artan's displacement from his home in Somalia, noting that he lived in Mogadishu until he was about six years old and then, "[f]rom 1991 until 2003, he resided in various refugee camps in Kenya." P.S.R. ¶ 38. Paragraph 127 of the Report discusses the journey in a little more detail.

In short, life was not perfect growing up in refugee camps while his country was shattered by war, but Mr. Artan got through it, and eventually immigrated to the

United States in 2006. He reached Minnesota later that year, where he has remained ever since. As noted in paragraph 127, Defendant struggled at first with acclimating to his new life in Minnesota, but he enrolled in school, eventually earning a B.A. from Concordia College and started a family along the way.

Professionally, he has become quite involved in helping economically disadvantaged people stay in their homes and apartments through housing outreach, homeownership advising, and housing workshops while employed at a few different agencies. He became acquainted with Minneapolis City Council member Jamal Osman who worked in a similar capacity before being elected to the city council.

To the great disadvantage of the family, Mr. Artan's wife developed an opioid addiction, and the couple separated in 2018. His wife sought to gain custody of the children and moved to San Diego. His wife's addiction grew worse, however, and after she had been evicted from her apartment in San Diego and suffered an overdose, Mr. Artan went to California to take care of the children and bring them back home to Minnesota. Mr. Artan became a single parent struggling to take care of the kids and enduring continuing struggles with his former spouse when she would show up demanding repeatedly to have custody of the kids.

It was at about this time, just after Mr. Osman was elected to city council, that Mr. Artan was named president of Osman's former non-profit, Stigma-Free International. Mr. Artan was economically struggling at the time, unable to devote

the time to work that was required by his employer while trying to take care of two young children. That is when he was convinced to permit Stigma-Free International to become a conduit for funneling fraudulent claims to the state for reimbursement from the Federal Child Nutrition Program funds. His role was limited, but he was promised a fee for his services from any reimbursements that were paid on the claims that he forwarded from the non-profit. He eventually agreed to do the same thing for another company called Olive Management, and later used another non-profit, Optimum Community Services for the same purpose.

Mr. Artan is still struggling with the dual tasks of taking care of his kids and trying to earn enough money to get by. He and the kids have had a temporary arrangement with his Aunt and Uncle to let the kids stay at their house, while Mr. Artan sleeps at a friend's house and saves up enough money lease a new apartment. That arrangement is scheduled to end this month, on 20 August, when the new lease on an apartment in New Brighton begins.

In the meantime, last November, the courts finally awarded Mr. Artan sole physical and legal custody of the children. That was followed by the filing less than a month ago of a petition to terminate the parental rights of Mr. Farah's former spouse – the children's mother. The petition was filed by Ms. Farah to terminate her own rights, based on her acknowledged abandonment of the children and her

inability to care for them. Based on the petition, it appears that she has relocated to Oregon.

SENTENCING RECOMMENDATION

As noted in the presentence report, Mr. Artan has no criminal history, and has never spent a day in jail. Since his arrest four years ago, he has been on pretrial release and has complied with every condition of that release. Any sentence that includes a period of incarceration would be a very severe sanction indeed. It also will contribute to the family's instability just when the mother of Mr. Artan's children is seeking formally to terminate her parental rights. A period of incarceration would do little to advance the goals of sentencing in this case, and plenty to delay a fresh start for Mr. Artan and his children.

Undersigned counsel recommends a sentence of probation. If an element of incarceration is deemed necessary, it should not exceed a week, and then be followed by supervise release with appropriate conditions. The bottom of the calculated guidelines range for the sentence is 33 months. Counsel recommends that the period of probation not exceed 33 months, considering that Mr. Artan already has successfully served four years of supervision.

The suggested sentence is certainly sufficient to achieve all of the statutory purposes of sentencing in this case.

Dated: 10 August 2026

Respectfully submitted,

GERDTS LAW PLLC

*s/ Daniel L. Gerdts*

_____

Daniel L. Gerdts (#207329)
331 Second Avenue South, Suite 705
Minneapolis, MN 55401
612-800-5086
daniel@danielgerdtslaw.com